Good afternoon and may it please the court. Matthew Feldman from the Pennsylvania Institutional Law Project on behalf of Helen and Brian Brown. I'd like to reserve three minutes for rebuttal, please.  Dr. Bloom and Nurse Knowles thought Brian Brown was manipulative, so they were willing to let him kill himself. But they had a duty to protect Mr. Brown from self-harm, regardless of its causes, and they do not dispute that they were aware he was likely to harm himself on the day in question. A jury could easily find that their complete inaction, despite that knowledge, was deliberate indifference. Let's talk about that awareness. That is, if we're looking, as I think both parties agree, at the vulnerability to suicide framework, the second prong of knowledge. Because you can take a sort of panoramic view of knowledge of his history and that there have been other incidents which may be different than on the particular day of February 11th. Which one are we to look at and what in our case law indicates that it's one time frame or the other? Your Honor, I think we're looking at both of those time frames in this case because there are sort of, I would say, three categories of information that Bloom and Knowles had that gave them the requisite knowledge on the day in question that he was likely to harm himself. So the ultimate question, though, is on the day of. And then the three things you're going to talk about inform why they had the requisite knowledge on the day of. Yes, Your Honor, that's exactly right. So they had knowledge of his extensive history of serious mental illness and prior self-injury events, suicide attempts. They had that knowledge. And then on the day in question, they had the knowledge that he had just been transferred from the Residential Treatment Unit, a structured unit for people with mental illness, to general population. And that's a transition that the prison's own policies recognize can be very difficult for people. And then they had the information that Civello gave them on the phone. Now, obviously, as Your Honor's know, we say that that information was flawed and incomplete. But what Civello did tell them was that she was concerned, that he was feeling suicidal. And we know that she believed he should be evaluated. That seems to be part of what is asserted as a factual dispute, whether or not she communicated that he was suicidal. But I'd like to get back to that. I know you were in the middle of your answer. So I apologize if you want to complete it. I'll circle back to that. I think well, those are the three categories of information. And to get to, Judge Chung, your question, I think what's disputed is Civello's awareness of the immediacy of Mr. Brown's suicidal intent. And what is, I think, undisputed is that she did not convey to Blum and Knowles, he has a very specific plan. He said he's going to do this right now. He said how he's going to deliberate indifference. Deliberate indifference is a conscious disregard of a risk. If she says there's suicidal ideation, as a matter of degree of how granulated that becomes, how's that deliberate indifference? If she takes action of calling and seeking an assessment, that doesn't seem like a conscious disregard of a risk. I think a jury could find that omitting the details that convey that this isn't just somebody who is having some suicidal thoughts, but this is somebody who has a clear plan of what he's going to do. And he says he's going to do it immediately. I think a jury could conclude that omitting that information is deliberate indifference. And I think that there are cases in which deliberate indifference has been found where incorrect or incomplete information has been given. I think a couple of examples. Sure. I mean, I could see that if she were to say – I mean, the competent evidence is his declaration. The complaint is not sworn under penalty of perjury. So his complaint just says thoughts. It doesn't say suicidal thoughts. It just says thoughts and anxiety. So if it were something like – if the call were something like, you know, he's anxious, he's kind of spinning his wheels, that's qualitatively different. But suicidal thoughts versus suicidal thoughts is going to bite his wrist. I'm not seeing that in the case law as being the type of degree that reflects deliberate indifference. Well, Your Honor, with the competent evidence, Mr. Brown's declaration here, he says that she downplayed the situation as thoughts and anxiety. He doesn't say in his declaration that she did convey that he was suicidal. So that's a little unclear from the record. I think his complaint does say that. His grievances do say that. The competent evidence here – It doesn't seem to be saying here that she did. I think a jury could find that. I think that's disputed. But let's put that aside because I actually think even if she didn't mention his suicidal thoughts, the combination of everything they knew about his history, what they knew about the transfer from the RTU to GenPOP on that day and the riskiness of that, and the fact that she picked up the phone to call them, said she was concerned. And we don't know exactly what she told them. We know that she believed – I mean, she put this in her entries in the medical records – that she thought he should be evaluated for possible placement in a psychiatric observation cell. What I'm saying is that the combination of all of those things gave them the requisite knowledge. And I'll note that Bloom and Knowles do not dispute that in their briefing to this court. They don't make any arguments that they lacked the requisite knowledge. They focus exclusively on the third prong of the analysis. They focus almost exclusively on this professional judgment argument. And I think their focus on that sort of belies any notion that they didn't have the requisite knowledge. That's just not the argument they're making. To what extent is the omission to which you're pointing – that is, she didn't provide the additional details about the specific plan to commit – how to commit to the plan – on Ms. Saviello versus on Dr. Bloom and Nurse Knowles to ask those questions? To what extent is that something that would be expected of those defendants? And are you arguing that their failure to take action includes failing to ask follow-up questions? Your Honor, thank you for that question. I think what I'm arguing is that their failure to do anything was unreasonable, and they had the requisite knowledge, so therefore, they were deliberately indifferent. Asking follow-up questions is absolutely something that they could have done. And I think it's worth keeping in mind that this is a fairly limited record here. Mr. Brown was pro se below. There are no depositions of any of these defendants. And it's certainly possible that a fuller record or a trial record would answer some of the questions that Your Honor is asking and may point to more liability for one set of defendants than the other. That's certainly possible. But based on the record we have here, I don't think either set of defendants has met their burden of establishing that they're entitled to summary judgment based on this record. Captain, it's a little naughty because you yourself have said the competent evidence of this declaration, it's unclear what Civiello imparted to Bloom and Knowles. And her deliberate indifference seems to hinge on her incomplete or her omission of certain details. But if we're to conclude that it did say something about suicide and the need for POC assessment, I mean, I guess what I'm struggling with is you could say reading that declaration in a light mood favorable to Mr. Brown, she communicated nothing of his self-harm intent, just sort of anxiety and thinking thoughts, in which case that might be a better case for deliberate indifference. But if you do that, then it diminishes deliberate indifference on the part of Bloom and Knowles because if they're told, you know, like, oh, he's a little anxious, you know, I'm not sure that that actually gives them knowledge that he has intent to harm himself on that day. So then it seems like, well, maybe it's more favorable to him to interpret it the other way. I guess another question for me, is it even reasonable to, you know, we can only draw reasonable inferences, and I don't know if a reasonable inference to say that the thought did not include self-harm, but that she imparted to them, that Savielle imparted, given that she was requesting a POC assessment and the only point of a POC placement is self-harm and mental health crisis? I think that last part of what you said, I think, is exactly right, that drawing all inferences in our favor, that inference could be drawn, that she must have said something that at the very least implies something to do with self-harm or suicidal intent. But does that diminish her deliberate indifference when she's telling them about his suicidal intent, that he's got self-harm ideation, he needs to be assessed? You know, how is it deliberately different to not add, and he said he'd bite his arm? I think it's not so much the, and he said he would bite his arm, it's that he has a plan, he said he's going to do this immediately. Well, the plan is to bite his arm. Sure, but I think the point is not the specific method, the point is that he had a plan. I think people know that when somebody expresses a plan, a clear plan of how they're going to commit suicide, that's something that needs to be taken seriously. So our argument is not just that she omitted certain information, it's also that she downplayed it as thoughts and anxiety. But for her, it's just a matter of degree. Sure, and the other point I will really emphasize here is that this is just one of two ways in which Zavella, I think the stronger form of her deliberative difference for us is that once, you know, she got off the phone with them, he said, I'm going back to my cell to end the pain I felt, and she then did absolutely nothing. And I think a jury could easily find that doing nothing in that situation is unreasonable. You know, deliberative difference, as I understand it, is subjective determination based on a person's mindset, right? Yes. And so we've got Zavella, and we've got Brown coming to her, and first interaction with him ever, right? Yes. So a little hard when you're assessing a person for the first time. And then she does calming exercises with him. When she's doing the calming exercises with him, you don't think that a jury could infer right then and there that she's deliberately indifferent, right? By doing the calming exercises? No, I think a jury could find she was deliberately indifferent in what she conveyed on the phone, and then what happened after the calming exercises. And so what would have to happen is that she's not deliberately indifferent when she's doing the calming exercises. And then something happens. She gets on the phone, and her mental state flips. It goes from trying to cure someone, trying to provide mental health treatment, to absolute deliberate indifference. That's a pretty big, radical flip for a person. I understand if he punched her in the meantime or did something harassing to her in the meantime, you could see a mental state flip. But deliberate indifference is quite a, you know, a real callous mental state. And she's not callous at the beginning. And you're asking a jury to say a person who treated a person for the first time, not callously, all of a sudden went callous on the phone, and then offers after that phone call, as I understand the undisputed facts, to resume those calming exercises. And then he says no, and then instead of it being a negligent medical judgment to let him go without following up, it was callousness again. And so it just strikes me as a real whipsaw of a person's mental state to go from caring to callous, callous to caring, caring back to callous. And I don't know that that's reasonable for jurors to infer. What do you say? I see my time is up, but I assume I can answer Judge Pipps' question. Judge Pipps, I don't think the deliberate indifference inquiry is sort of this, you know, general inquiry into a person's overall state of mind. Yes, it's a subjective inquiry, but the subjective aspect, I mean, it's partly subjective. The subjective aspect of it is the knowledge, right? And Cervello waived any argument that she lacked the requisite knowledge. So then we go to the next problem of, okay, well, how did she respond? What did she do in light of that knowledge? And that is not an inquiry into sort of what her thinking was. Was she trying to harm him? Was she being callous? The inquiry at that point, and this is clear from Farmer and this court's deliberate indifference cases, the inquiry at that point is, did she act reasonably in light of the knowledge she had? And the difference between deliberate indifference and negligence is, on the first part of the analysis, the fact that she had to have actual knowledge and that is not required for a negligence claim. The inquiry, once that actual knowledge is established, is, okay, did she respond reasonably to that risk? And I think a jury could certainly find that doing absolutely nothing when he said, I'm going back to myself to end the pain I'm feeling, was deliberate indifference. Conscious disregard. Conscious disregard of the risk. That's lower than unreasonable. Well, the conscious disregard, the conscious part of that is the subjective knowledge part of the deliberate indifference inquiry. But then, I mean, Farmer says this three or four times just in Farmer itself. This court's case is repeated over and over again. Once that actual knowledge is established, did the defendant take reasonable measures to abate the risk? That's the inquiry. Sure, it can be described as conscious disregard, but what the actual inquiry is, is, did the defendant take reasonable measures to abate the substantial risk of harm that they had knowledge of? And so you think that our case law in Farmer reads the Eighth Amendment basically as saying, once you have actual knowledge, it's basically a Med-Mal claim? I mean, that's certainly not how I would rate. Because reasonableness is the hallmark of tort claims. It's one of the hallmarks of tort law. And so I guess what you're saying is the only thing that separates an Eighth Amendment claim is that you have subjective knowledge of risk of self-harm. And then after that, we're just going to do the tort law analysis for how your response is. You think that's what Farmer and our case law says? We're going to blur the Eighth Amendment and tort standards that quickly? I mean, Your Honor, the literal holding of Farmer uses the language, you know, taking reasonable measures to abate the risk. So that is the inquiry. I mean, if you look at this court's decision in Hamilton, there you have a situation where defendants made a recommendation for the person to be housed somewhere where he wouldn't be at risk. That recommendation was denied. They then swore there was nothing else they could have done. Nonetheless, this court said summary judgment was improper there because the jury could have concluded there were additional reasonable things they could have done. That's what the cases say. I think it's wrong to say that it's just Med-Mal at that point or just negligence at that point because there's a huge difference on the front end of the analysis as far as how we analyze the risk and the awareness of the risk and whether we need to establish awareness of the risk. But once that actual knowledge of a substantial risk of harm is established, you know, the cases make very clear that the inquiry is, did they have a reason with that? I'm basically hearing you say it's awareness of the risk plus the Med-Mal standard. I mean, you know, I'm telling you what Farmer says. I mean, that is what Farmer says, that if you have actual knowledge of a substantial risk of harm and you fail to take reasonable measures to evade that risk, that is deliberate indifference. That is what Farmer says in crystal clear language in its actual holding. Can we look at that from the perspective of the medical defendants here? Do you agree that professional judgment has a role to play in evaluating whether the steps taken are reasonable? I think it can. I have a few responses to that. One, when the medical defendants have taken no action, have not provided treatment at all, so it's a denial of care claim as opposed to an adequacy of care claim, there's no presumption that they were exercising professional judgment. So what that means is that as long as there's something in the record that the plaintiff can point to from which a jury could conclude that they were not exercising professional judgment, then summary judgment can't be granted. And I would say in most, almost every denial of care case, that denial itself, the refusal to do anything is going to provide that evidence of lack of professional judgment. I think, Your Honor, the opinion you wrote in Martinez, I think is a good example of that, where the nurse, actually, sorry, I'm sorry, it was a doctor, you know, refused to examine the plaintiff, and that stated a claim. You said that that was not a mere disagreement with medical judgment, that that stated an Eighth Amendment claim. Now, I want to be very clear. I think if Bloom and Knowles can convince a jury that doing nothing here was, in their professional judgment, a reasonable way to abate the risk that Mr. Brown would harm himself, they'll prevail. Like, if they can persuade a jury of that, they win. I think that's a very steep burden for them because the inaction itself creates a strong inference that that was not medical judgment. But I'm not saying that professional judgment has no role to play in a case like this. I'm just saying that it's going to be a very steep burden for a defendant, and there's no presumption that it was exercised. What is the alternative on this record? Because they both put in their affidavits saying that because of the history of secondary, the infant's self-harm for purposes of secondary gain, that for his own safety, they didn't want to, in effect, reward raising his desire to go back to PSD placement. Where we have that on the record, what is it that counterbalances that? Why isn't that just the undisputed record as to their subjective thinking here? Well, I think it's really important to make clear that they are not saying, we didn't think he was really going to harm himself that day. We thought he was just saying this so that he could get placed somewhere else. That is not what they're saying. They're saying, we know he was likely to harm himself. They say that in the records before this incident. Dr. Bloom says it in the records a few days after the incident. He's still at risk of harming himself. They're acknowledging that risk. They're then saying, nonetheless, we're not going to do anything for him. Yes, they have the explanation that Your Honor just gave. If that makes sense to a jury, then they may prevail at trial. I think it's illogical, the idea that we're going to ignore him even though we know he is likely to harm himself. Somehow, that's protecting his safety. It's just sort of illogical because, again, they're acknowledging that he is actually at risk of actual self-harm. I think the question is, what is it medically they could do? We could give him meds, but that's not going to change it because he doesn't actually have a suicidal ideation. In other words, he might want to self-harm for secondary gain, but giving him medication is not going to change the desire based on secondary gain. Whereas, if it were a desire to harm oneself because there was severe depression and a genuine desire to want to end one's life, perhaps medication could alter that. Or we could give him counseling, or we could just do any number of medical treatments to address the intent of self-harm. When it doesn't actually, it sounds like you're saying they had to give him medical treatment even though it was not, even though medical treatment did not actually change any intent to harm himself. Your Honor, if I'm asking, aside from medical interventions, is there anything you're saying that could have been done or that they should have done? Yes, Your Honor, and I have a couple of responses to that. But first, I think that's why it's so important that this claim is not a medical care claim. The claim that Mr. Brown brought was a claim that these defendants were deliberately indifferent to his risk of self-harm, not that they provided him with inadequate medical care. And that's one of the reasons why the district court's failure to apply the correct framework was a problem here, because it led the district court down this road of considering medical treatment. Vulnerability of suicide sort of lends itself to that. I mean, I agree. I'm not sure that that's the best framework, because the question seems to be more, was there an actual intent to harm whether it's for secondary gain or suicide? And given that person's position, was there conscious disregard of that risk? So, and I'm not saying that their deliberate indifference stems from the fact that they didn't provide medical treatment. What I'm saying is that doing absolutely nothing for him, despite the knowledge that they had, was deliberate indifference. So what are the things? Oh, yeah. Well, I mean, I think the failure to do anything is what is unreasonable in that situation and is what is deliberate indifference. Things that they could have done, they could have brought him up for an evaluation. They could have given Savello instructions about what to do to keep him safe. Even if they didn't think his condition stemmed from what they considered to be a medical issue, they still could have given her instructions about things to do to keep him safe. Instead, they did nothing, but also told her to tell him to work through it, which I think in that situation, a jury could find affirmatively contributed to what he did. The other response I want to give to Your Honor's question is that I think sort of part of the premise of your question, I think sort of resolved a factual dispute in defendant's favor. Whether Mr. Brown, whether his suicidal ideation stemmed from so-called genuine mental illness or something else, motivation for secondary gain, et cetera, that's disputed. I mean, a jury could certainly disagree with Bloom and Null. There's ample evidence in the record from all of his prior housing placements, from his commitment to the mental health unit, which is like equivalent to being committed to a state mental hospital, all the medications he was on, his diagnosis. Well, it might be true as a matter of fact, that the dispute is whether they genuinely believed it to be, because that's what we're talking about with deliberate indifference. But let me ask you a different question, because I know we've been going past your time for a while. This is the last one I want to ask you. With regard to professional judgment, and going back to your argument that the best basis for saying their summary judgment was improper for Civiello is because after they denied her request that he be assessed, he stated an intent to harm himself and she let him go. I guess my question is, if she's been told by professionals who are familiar with him and have been treating him since November, and they tell her, you know, that's not actually a real intent to harm himself, why can't she rely on that? I don't think the record supports that they told her that's not a real intent to harm himself. There's nothing in the record that says that that's what they said. The record says that they said, we're not going to evaluate him, this is his baseline, tell him to work through it. Right, this is the baseline. I mean, that's not imminent. I don't know exactly what that means, but that does not suggest to me, we don't think he's actually going to harm himself. That suggests to me maybe something like he is often in this state or he says things like this often, but it doesn't suggest to me that they were telling her, we don't think he's going to harm himself. And look, Civiello, there's a declaration from Civiello in this record. Civiello doesn't say in her declaration, they told me he wasn't really going to harm himself. And I agree, look, if the record established that they told her, don't worry, we know him, he's not really going to harm himself, you don't have to worry about anything here, this would be a very different case and a very difficult case for us against Civiello, but that's not what the record says. It feels like they say this is his baseline. You know, I mean, it feels like you're putting, the only way that she can avoid is if they basically avoid being deliberately indifferent is if they said that to her, don't worry, he's not going to harm himself. She's not allowed to interpret her first interaction with him. She's not allowed to interpret this being his baseline as something like, look, we don't have a heightened risk. Their instruction to her was offer, if I recall, offer to resume the calming exercises. That doesn't strike me as an instruction that at least if she's following, it's consistent with some degree of imminent risk of self-harm. Just continue, if he wants to, continuing the calming exercises. Okay. She offers, he declined. I will grant that a jury might be able to draw those inferences that your Honor's question entailed. In other words, particularly equating a statement, this is his baseline with there's no risk here. A jury might be able to draw that inference, but that's not an inference that defendants as the summary judgment movements are entitled to on this posture. To the contrary, were entitled to the opposite inference that they did not tell her, you know, that that was not a way of communicating that he's not at risk. And again, if she put a declaration in this record, I presumably, but no, no, no. I think my point is you were saying she can only avoid summary judgment if she says they didn't tell me that he's not at risk. I think I'm hearing you on your theory saying, yeah, you know what? She, she could win at summary judgment and have it affirmed if she said that they told me he's not at risk, but anything other than that, from what I'm hearing from you suggest that this is a question for the jury. I don't know if I'm saying anything other than that, but what I'm saying is on this record that we have here, a jury could easily conclude that she's still, she was still aware of the risk. And again, she literally waived this issue. I mean, for summary judgment purposes. So the whole knowledge problem. So if she had wanted to argue that at a certain point, her knowledge changed, she could have argued that, but she affirmatively waived that below. So that, Savella's knowledge is not on the table for this court consideration because there was an affirmative waiver. So I don't think this court can even, can even reach that. One thing we consider is her position as a non-medical professional relative to the doctor and nurse. Does the same consideration come into play when we're talking about Dr. Bloom and Nurse Knowles? Is there anything in the record that indicates that phone conversation with them was separate with the two of them? That's not clear to me from the record, Your Honor. I will be totally honest. I'm not, it's not clear to me whether there was one phone call that somehow they were both on, maybe on speakerphone or two separate calls. That's certainly something that I'm sure would come out, you know, on remand, but that's not clear to me from this record. If we assume that it's a single call and the doctor is saying that this is the baseline and whatever else is communicated, do we take account of his position professionally relative to Nurse Knowles? I mean, considering what else she should have done if the physician is saying nothing further needs to be done? Yeah, I think the reason why that doesn't really come into play much here, and this would be my same answer if you asked me the same question with respect to Civello and her relationship to Bloom and Knowles, sort of two responses there. One, that this is not a claim about adequacy of mental health or medical care. It's a claim about fair to protect from self-harm. So, deference to professional judgment doesn't, you know, there's not the same sort of deference to professional judgment that there would be in a case that was about medical care. So, you know, if this was a case where we were saying they should have given him some sort of medication and the doctor said no, then that would not be much of a case against Civello and Knowles, but that's not what this is about. And then my second response is just that what this court's cases say, even if you were to sort of view this through the lens of a medical care case, what the cases say is that a non-medical professional, you know, same goes for a nurse with respect to a doctor, can still be liable if they have reason to believe that the person is not receiving care from the physician or is receiving inadequate care. And when here the physician says, I'm not doing anything for him, that they have ample reason to believe that the physician is not providing care, so they cannot rely on their inferior rank. I think an analogy that you could think about is this court's failure to intervene cases, which usually arises in the excessive force context. But what those cases very clearly say is that officers have a duty to intervene to prevent excessive force, irrespective of their rank. In other words, you could have the lowest-ranked corrections officer witnessing a superintendent of the prison beating somebody up, and they still have a duty to intervene. I think that's sort of a better analogy for this situation than the sort of textbook examples of, you know, deference to a higher-ranking medical professional. And when you say there's not deference to professional judgment, are you, you're not asserting that professional judgment is not a consideration in the vulnerability to suicide framework, are you? I'm not asserting that it is categorically excluded from the vulnerability to suicide framework, not at all. But what I am saying is that it is not, it is not the only consideration, because responses to risks of suicide could be medical responses, but there are other potential responses too that have nothing to do with providing medical treatment. And this court's cases don't require for a vulnerability to suicide claim, do not require that the risk of suicide stems from a medical condition. So, and there's certainly plenty of things that one could do to prevent or reduce the risk of a suicide that have nothing to do with providing medical treatment. So if Blum and Knowles made their decision to avoid encouraging further self-harm from Brown, is that a medical justification? It's, it's, it's not an adequate justification to do nothing to prevent the risk of self-harm, which they acknowledge existed. I'm not sure if I answered your question, but I'm trying to. Judge Krauss is asking about what the role of professional judgment is, and I, and you seem to suggest that it has some role to play in, in, in even failure to protect from self-harm. And so my question was, if in their professional judgment they made the decisions that they made to avoid encouraging future efforts at self, self-harm, isn't, isn't that an adequate professional judgment to avoid liability under the Eighth Amendment? Well, as I think I said a jury concluded that their doing nothing despite the acknowledged risk was in their professional judgment, a reasonable response to the risk and a reasonable way to prevent the harm from actually happening, then, then, then they would not be liable. So the question for the jury would be, okay, well, this is what they say. I'm assuming it gets to the jury. And what of professional judgment? And this was the product of professional judgment. How does that reflect deliberate indifference? Well, I think that that question embeds, again, a resolution of a factual dispute that that is not proper at this stage. It is disputed whether they were exercising professional judgment. There's ample reason here from which a jury could conclude that they were not exercising professional judgment. There's the inaction raises that inference. I think Pearson and Martinez make that very clear that the complete inaction itself raises that inference. In addition, their comments about wanting to prevent him from trying to manipulate his housing assignments, that is the kind, that is a non-medical motivation. And if a jury finds that the decision was based on that, then, then, then they lose and a jury could conclude that. So, so the professional judgment issue is very much in dispute and it goes to their credit. Could it be a professional judgment that it's not a medical issue? I'm sorry, could it be a professional judgment that it's not a medical issue? That it's not a medical issue. I mean, if that is, again, you seem to be arguing as a factual matter, it's truly a suicidal ideation versus for secondary gain. But we're talking about deliberate indifference here. So the issue is whether in their professional judgment they made an assessment based on their medical knowledge that this is not a medical issue. Getting something wrong, but sincerely, is not deliberate indifference. So I think that's what we're trying to understand is if, is, is saying if it's a professional judgment that this is not a medical issue. And again, if it's not a professional judgment from ignoring him or just deciding suicide's not a thing, then isn't that part of our analysis in determining whether there is in fact a jury issue here? Saying that in their professional judgment, it's not a medical issue wouldn't be enough to absolve them because they still acknowledge there's a risk of self-harm and their duty to respond is not limited merely to the medical sphere. A couple of examples might make this a little clearer. I mean, imagine a situation where a physician, a prison physician receives a reliable notice that a prisoner patient of his is going to be assaulted by another prisoner. And then the physician does nothing to try to prevent that. I don't think we would be here talking about whether that was an exercise of professional judgment. We would be, we would be asking whether they responded reasonably to that known risk. Well, that's what I was asking you about before in that it doesn't seem to necessarily be about whether it's truly suicidal motivation or not. It's just, is there in fact a substantial risk of serious harm that they are aware of? That's exactly right. That is the inquiry here. And they don't contest that the answer is yes, there was a substantial risk of serious harm that they were aware of. They make no argument against that. So, you know, we're at summary judgment and at summary judgment, we don't engage in credibility assessments, if anyone. And so we've got this statement in the Bloom affidavit that says, quote, I sought to avoid encouraging further self-harm on his part motivated by a housing assignment. Why isn't that a, doesn't that just kind of solve things in terms of, he said, this is what my professional judgment is. I believe this to be reasonable in my professional judgment. I'm trying to discourage self-harm. And I think that his basis for using self-harm was to manipulate his housing assignments. I didn't want that to happen because that seems to be what his self-harm is tied to. We can say that's flawed. We can say that's a problem. We can say a lot of other things, but if professional judgment comes into play, this is an explanation of professional judgment. Isn't, I mean, doesn't that kind of solve it from a deliberate indifference state? No, because the jury can still conclude based on this record that that was not a reasonable response to the risk that they acknowledge here. And a jury could find it not credible that ignoring somebody who you know to be at risk of to somehow protect them from self-harm is not an exercise of professional judgment. And that's why this court's cases say that there's no assumption, there's no presumption, excuse me, there's no presumption that professional judgment was exercised when no care was provided at all. That's what this court's medical care amendment cases say. And that's the situation we have here. Okay. There are no more questions. Thank you. May I please report? My name is Hannah Kogan and I'm a Deputy Attorney General for the Office of the Attorney General here representing PSS Savello. As this court is aware, I have somehow only given myself six minutes of time to address the claims against my client. In this case, my co-appellee will have nine minutes. As you can tell, you'll be on our time. Great. I appreciate it. My client, PSS Savello, was not deliberately indifferent to Brown's particular vulnerability to suicide here. I want to read three critical quotes from his brief that are telling and cannot be squared with his theory of liability against my client. First, quote, Savello thought that Mr. Brown should be evaluated for possible placement in a psychiatric observation cell. So she called the prison's psychiatrist and psychiatric nurse practitioner, end quote. Second, quote, Savello believed the situation warranted action by the psychiatrist end quote. And third, quote, Savello was sufficiently concerned that she determined Brown needed to be assessed by psychiatry for possible POC placement, end quote. That's at pages 1, 7, and 32 of Brown's opening brief on appeals. Those statements were not before the trial court below. But what was before the trial court was a record where on three separate occasions, Brown stated very clearly that Savello conveyed that he was presenting with suicidal thoughts and suicidal ideation. Now, that's first in the amended complaint. I think that's competent evidence. He didn't swear to it. It's not under penalty of perjury. Your Honor, respectfully, he actually did at District Court ECF 32 at 5 paragraph 7. Brown stated with declaring under penalty of perjury. Dr. Adam Bloom was informed by defendant Brooke Savello that plaintiff Brian Bowne was having suicidal ideation. But how is that under penalty of perjury? Brown provided that statement and declared it under penalty of perjury. That was provided. That's in the record, Your Honor, from Brown. So give me the JA number. It's not in the joint appendix, Your Honor. It is in the record. However, at District Court ECF 32, page 5, paragraph 7. Are you citing to the complaint? No, Your Honor. It's actually what was provided by Brown in opposing my co-appellee's motion to dismiss in the court below. Okay. I'm just trying to understand. So it's not the declaration that's in the appendix. It's a separate and different declaration. Yes, Your Honor. It's an opposition or statement provided by Brown when he is opposing my co-appellee's motion to dismiss. And at the bottom of that same page that I've cited, he says, I declare the foregoing under penalty of perjury. So my understanding is that that is a declaration by Brown himself. But you are correct, Your Honor, it is not in the joint appendix. Okay. I'm cracking. Sure. And but it is also consistent with his amended complaint at joint appendix 37, which is certified under Rule 11. And then also with his own grievance form here, I believe that's at District Court ECF 67-4 at 5. So many of the actions that she takes are not reflective of deliberate indifference. And it's certainly a far cry from our Hamilton case. But I take Mr. Feldman's point to be that at least at the point that she knows there's not going to be action taken by the doctor or nurse, and he's still indicating an intent to self-harm, that there is conceivably more that could be done. Why isn't that sufficient to go to a jury on the question of deliberate indifference? Sure, Your Honor. So first, it's not that she didn't do anything from there. As I believe Judge Fitz mentioned, she actually offered to continue the session with him. He declined to do so and turned to his cell. And again, this is actually summary judgment. There's a bunch of mentions of reasonable inferences and what a jury could believe. I think my friend on the other side has actually skipped a step. As a moving party, we needed to have a motion that demonstrated there was no dispute of material fact as to whether or not my client was deliberately indifferent. We provided that, and then it was then on the non-moving to provide facts, point to specific facts in the record to actually create a genuine dispute of material fact to overcome summary judgment, to show that there would be an issue for trial. Brown failed to do that in the district court below. And Civello, like other persons officials, are not expected, required, nor it would be impractical to actually expect them to do everything humanly possible that we can think of now with the benefit of 20-20 hindsight at this point in the game. The deliberate indifference standard is that she needs to respond reasonably to how Brown presented. Sure, but in the record, if you look at December 30th or November 30th and December 1st, now, these are notes made by Bloom, but they're in his psych notes and part of the record. It states, security has restricted belongings due to gestural threats. Security aware, Mr. Brown may act out in gestural threats and has potential to carry these too far. And you're not contesting knowledge or ignorance of these records. I mean, it's clear that from the record that there are communications between security and psychiatry. So, I mean, it doesn't, it's, the evidence seems to be that even if her, she tried to get an assessment, was denied, she tried to engage in the calming exercises, it seems that she could have, when she saw him leave, and there is a genuine, it seems there's a genuine dispute about whether he said, I'm going to go end myself now. That's not in any of the health records or in her declaration, but it is in one of his sworn declarations. And that's what your opponent thinks is the best basis for deliberate indifference. But it seems like she, it was a reasonable measure as established by what's in the record to just call security and say, there's a gesture here. He needs to have his restricted belongings. Your Honor, that's from November and December. I believe his housing had actually changed on the day in question. He was actually cleared to go to general population. So, in terms of what belongings he may have been permitted at that point, that may have very well have changed, first of all. Right. But that's my point. It seems like that's a reasonable measure she could have taken, was to call security and say, there's a gesture. I've done the suicide assessment. He's high risk. They're not putting him in POC. But that may tell her that he's at baseline, Your Honor. And then he says, I'm going to go end myself now. That's like, that is something that is competent evidence in the record. So, my question is, is it not a reasonable measure to call security and say, hey, he's not getting assessed for POC, but I found high risk based on this assessment. You might want to consider restrictions. Respectfully, Your Honor, we're then talking about the reasonableness of her decision. We're in the world of deliberate indifference. So, it's just a matter of, did she fail to respond reasonably at that point in time? Well, that's what I'm asking. Is that part of a reasonable response? Right. But a reasonable response is also considering the totality of the facts presented. That's what Palachowicz says. And the facts at that time also include that this is his baseline. To your point, if they were maybe at his cell together and he said, well, look, I also have, look at all these, the 65 pills I have under my pillow too. Then I would take your point, Your Honor, that perhaps she should have notified a CO. And that would have been a reasonable response. It would only be reasonable if she knew what was in his cell. No, Your Honor. It's that whether or not it's imminent and understanding that he was at baseline, even though he was having these suicidal thoughts, I'm going to harm myself right now. It's no different than how he presented and how she articulated and conveyed he was presenting to the medical or psychiatry appellees. And she, with understanding that he has been fully treated by these psychiatry appellees for months, and this is her first time interacting with him under Dermer and, I believe, Spruill, she has no reason to disbelieve this is his baseline. Again, it's also in the records. He has substance abuse disorders, personality disorders, depression, anxiety. It's fair to say that at times individuals that present like this, the possibility is consistently there that they may commit suicide. But here, in a part, what I'm hearing from you is based on the totality of the circumstances, the most important at this moment in time being the doctor and the nurse have told her this is his baseline, then her response was reasonable. Her response to not doing something. But that sounds like it goes more to knowledge of risk, which your friend on the other side argues you forfeited any argument. We succeeded the second element that there was knowledge by my client that he had a particular vulnerability to suicide. We still look at the totality of the facts and look at the narrative here and how he presented. After she understands that he's at baseline, there's no longer a strong likelihood for my client, according to my client, that he may commit suicide. There's maybe mere possibility. But in Colburn, that's a distinction here that I think that that seems to be contesting her knowledge of what the risk is rather than her reasonableness in responding to the risk. We did concede this and we did not, I guess, provide a caveat for every step of the narrative and every step along the way where that may have changed. However, it would still be our position today that you do have to look at the totality of the facts presented, look at its subjective and objective for the deliberate indifference standard. And upon being informed that he was at baseline, she still offered to continue the session with him and he declined. There's nothing in the record to dispute that she was not deliberately indifferent. If there are no further questions, I will. Okay. Thank you. Thank you. Good afternoon, Your Honors, and may it please the court. My name is Cassidy Neal. I'm from the law firm of Baum, O'Connor, Cullen, and Schneel, and I'm counsel for appellees Dr. Bloom and CR&P Knowles. The district court's decision to grant summary judgment in favor of appellees was appropriate and should be affirmed because the evidentiary record is clear that Bloom and Knowles used their professional judgment in deciding how to address Mr. Brown on February 11th, 2022. The court was specifically focused on whether or not the appellees engaged in deliberate indifference. There was not a focus on whether or not Mr. Brown demonstrated a particular vulnerability to suicide or some other serious mental health needs, nor was there a focus on or not the appellees were aware of that possibility. You've forfeited the vulnerability and knowledge. They make no appearance at all in your brief. That's correct. That's correct, Your Honor. The focus of the district court in granting summary judgment was specifically related to whether or not the conduct of my clients amounted to deliberate indifference, and that's what was addressed in the brief on that basis. Here, I would argue that these parties did not do nothing as plaintiffs claim. Rather, these were individuals who were involved in Mr. Brown's care for many months leading up to February 11th, 2022. Given that they're involved for many months, they know his medical history. They know he's had six suicide attempts and three that are essentially in the last six months. And we have conceded that he has the particular vulnerability to suicide and their knowledge of that vulnerability. How, under those circumstances, is doing nothing so clearly a matter of a reasonable professional judgment that there's no jury question? Well, I would disagree that it's doing nothing because this was a calculated decision made on behalf of Dr. Bloom and CRNP Nome. Why isn't that just a calculated decision to do nothing? Because they were attempting to change a pattern of Mr. Brown's behavior. Mr. Brown repeatedly made threats of suicide to get a placement in the POC, the mental health unit, and when he was discharged from the POC or moved back to a unit that he disliked, he would repeat this process. But why can't they take actions that are in the record that have been taken before, which I referenced with regard to Ms. Saviello, that security has restricted his belonging, security aware? I mean, your point is taken as far as the POC maybe not being an appropriate response in awarding secondary gain, and maybe that is a calculated decision in professional judgment, but it doesn't speak to alternatives that are in the record that have been taken in the past. Sure. So, first, my clients had already made aware of security that this had been an issue. They were aware that this individual was meeting... But where is that in the record as to... It is in the prior record. It's not on February 11th, 2022. I'll admit that is not something that they notated or that they contacted security directly, but security at FBI Housetail was already aware that this was an issue and they had notified security of this in the past. In addition, this individual was being assessed by psychology. It is clear that he had calming exercises and psychological services were being provided to him, and it was specifically determined that engaging with him, placing him in psychiatric observation, continuing to address these complaints in their professional opinion was not going to benefit him in any way. How could they make that assessment? Dr. Bloom hadn't seen him for two months. Nurse Noel hadn't seen him for three months. How can they make that assessment without speaking with him, meeting with him, observing him, asking, as far as the record reflects, asking any specific questions of Saviello, including whether he had a specific plan? Well, this is something that they had already determined was going to be the course of action. If you look at Dr. Bloom's notes from November, December, in the months prior to this, the psychiatric observation cell placement was not going to be an appropriate thing for this individual, that this was someone that, in his belief, was trying to manipulate his housing. Again, on the day that he is moved to another unit that he is dissatisfied with, that is when he makes this threat, and Dr. Bloom and Joyce Noel determined that it was not appropriate for them to engage with him, place him in psychiatric observation, and continue this process. But to go back to Judge Chung's question, so perhaps the POC placement is not the best course in their medical judgment, but to take no further action when the medical history indicates that he has and may again engage in actual suicide attempts, how is doing nothing further in that circumstance, how does that preclude a jury question as to whether it was reasonable or not? Well, as is documented in their affidavits, this was something that they thought to avoid encouraging this continued behavior, and assessing him, interacting with him, bringing him up to the unit where the POC is located, that would be encouraging this behavior. But I guess to Judge Krause's point, I could see that being a function of professional judgment if it were more contemporaneous with those November and December notes, but it doesn't seem any steps were taken to ensure that, in fact, this was a gesture based on secondary gain rather than a genuine mental health crisis. It's hard to say that not having actually, I mean, and going on the record here, not having asked any questions or getting any additional information, just denying the request. Certainly there was a call with the psychologist, right? And although there is a call with a psychologist, what are you referring to? So Civello's call to Bloom. So there was information that was exchanged there, enough for them to understand this is an individual who is yet again being moved from one unit to another unit. He's dissatisfied with that and threatening. But how is there enough in the record to know that that was, they were able to determine that this is secondary gain rather than an actual crisis? Well, if you look even to Dr. Bloom's notes subsequently to this, right, he documents his continued belief that further psychiatric interventions such as POC or referral to MHU will only serve to reinforce his acting out, making it more likely to occur in the future, which is not in his best interest. This was their professional judgment. This was their decision making. And as Judge Phipps previously mentioned, this could have been wrong. But that's not what the question is here today. The question isn't whether there was a violation of the standard of care, whether this was negligent, whether they were mistaken in believing that he was trying to manipulate his housing. Rather, the question is, were they using their professional judgment in making this decision? Is it enough that there's some professional judgment involved? Or do we consider the reasonable, whether it's reasonable professional judgment in view of professional standards of care? Well, we're not to consider the professional standards of care here, right? That would be a negligence claim. And if Mr. Brown wanted to assert a negligence claim, he could have done so. And he could have alleged that this was a mistake. I was not malingering. I was not manipulating. This was wrong. They made the wrong decision here, and so I hurt myself. But we're not allowed to look to the subsequent treatment, or the subsequent incident that occurs to be indicative that there was some deliberate indifference. And we're also not allowed to consider the standard of care when we're talking about whether or not the professional judgment was deliberately indifferent or not. There's a record that... If we take as a given that he is on this day, that he has a particular vulnerability to suicide, and that they know that, it sounds like your argument is that they can make a professional judgment that it's in his best interest to avoid future self-harm for purposes of secondary gain to proceed to attempt suicide. Is that your argument? No. I'm not entirely sure I'm following, Your Honor, and I apologize. But my argument is that there was a history documented from prior to SDI Housetail, at SDI Housetail, both from Dr. Bloom, other providers, that this was a continuing pattern. And when the pattern reemerged on February 11, 2022, it was their decision that if they interacted with him, it would only continue to encourage this behavior. So their professional judgment was that allowing him to continue to work with psychology and going back to his cell was the appropriate step to take here in order to discourage this type of behavior from occurring, whether it's going to be on February 11 in the future, just not continuing to acknowledge it, because it hadn't worked in the past. What actions did they take to mitigate the immediate risk of attempted suicide? Well, I would suggest that their prior notification to security that this was an individual who would continue to act this way is already on the record. It is something that had occurred in the past and was already, security was already aware of. And additionally, they ensured that he had this consultation with a psychology provider, someone who could provide him with therapy and counseling services. You know, the case law talks a little bit about, some of the case law talks about reasonable safety. You know, prison officials have to provide reasonable safety to inmates. Do you think that reasonable is kind of a singular sort of thing? There's only one way to have a reasonable response to things? Or is this the role that professional judgment comes in where you could sit there and say, you know what, there's a range of treatment options. Many of those are reasonable. Sometimes you make a reasonable decision and it doesn't avert the harm. The harm still happens. But we aren't supposed to look ahead to find out what the harm is. We're supposed to say, but if reasonableness is singular, then it seems that we're tied much more looking at, hey, we want the whole picture. We want everything and we want the consequences of it. What version of reasonableness is it? Is it anything that, is it kind of a range of reasonable options or is there singularity to what constitutes reasonableness? Because that kind of affects what goes to a jury because the more singular it is, the more that might be a question for a jury and the more that it's a range if it's within one of those, then maybe it's summary judgment. It is a range because the courts have been very clear that we are reluctant to second guess the medical judgment and to constitutionalize claims which found in state tort law. So if it is a singular reasonable answer, this is what they should have done. They should have picked up the phone and done this. They should have brought them up and evaluated. Now we're talking about negligence. We're talking about medical malpractice. Rather, their decision was to discourage this type of behavior. And if there's an expert that wants to come in and say that the standard of care had been violated by these individuals, that's one thing. But we're talking about deliberate indifference and we're talking about what the standard is for summary judgment. And these individuals did something that they believed was reasonable. They believed that this was something that they could try to put an end to, right, stop this pattern of behavior by discouraging it, by not engaging with it, by not placing in the POC. They did not believe there was some medical intervention that they could do. Medication wasn't working. Psychiatric observation cell wasn't working. Mental health unit placement wasn't working. This was an alternative treatment, a step that they were taking in an effort to avoid this from happening again, in an effort to see what would happen if we tried a different plan. Because the plan that had been in place for months was not working. And while there are plenty of things... And that's what Judge Cross was asking you. So is it reasonable to say, well, there is a substantial risk to harm himself today, but it's reasonable for us to let him harm, to let that risk go without further action? Because then ultimately it will end a cycle of repeated self-harm. I certainly don't think that there's any evidence that they said, well, let's let him harm himself today, right? I think the evidence here is, you know, he goes to see a psychology provider. Some communication is given. The record is unclear there as to what was communicated between Civello and Brown and Knowles. And their decision was, we're not going to bring him up and evaluate him. Not that, oh, hey, yeah, go ahead and let him hurt himself. That certainly wasn't their decision. Right. I'm just talking about knowing that there is a substantial risk. But also knowing that... Knowing at the point of transition, this is the day that he's moved and it's in his records, that that's going to be an inflection point. Is it, I guess what I'm asking is not necessarily, and I think Judge Krause was trying to ask this too, is that I know you keep emphasizing that nothing was done, but as far as what Bloom and Knowles did, they did not do anything other than say, you know, he should work through this. And again, they could have, it seems from the record, reiterated their calls to security and said, you know, he has active gestures now, and this is an inflection point, a recognized inflection point, or, you know, taken maybe some other actions, even if just to ask more questions to understand if they're still on the right path. And so I guess that's the question. Is it reasonable? I know you keep saying it's not nothing, but to proactively do nothing. And I would go back to this. I don't mean to continue to repeat myself, but the fact that security had already been made aware of the situation. He was interacting with psychology. These things are already in place. And from their perspective, it was reasonable not to continue to engage with him further. I think there are a variety of other things that potentially could have been done, right? They could have restrained him. There's so many things that are on the scope of potential interventions that can occur. But that is what brings this case into a negligence question versus a deliberate indifference question. Let's assume that there's evidence in the record that he will harm himself, that that's a that's known to them, and that's what he's going to do. Would it be a reasonable medical judgment to say, well, we'll let him do that to end this cycle of self-harm for purposes of secondary gain? No, I think that the case law is clear that providers, to the extent that they know that imminent is going to occur, must respond to it. My position here is that this is what they did to respond. They made sure that he was being seen by psychology, security was aware of the situation, and they didn't want to continue to encourage him by providing some sort of medical or psychiatric intervention, because that was not going to be effective here. So if you agree that that would not be reasonable steps, if you were certain that someone was going to engage in self-harm, how can they know whether or not that is the case on this record without having any further communication, evaluation, observation, asking any questions? I mean, you're saying it's enough that he was seeing the psychologist, but it's apparent on the record, and presumably was to them, that the psychologist had made a determination that the referral was necessary for assessment for the POC placement. But I don't think, though, that that first portion is there, that they knew that he was going to engage in self-harm. They knew that he was making a threat of it. They knew that he had just been moved to this other unit, not that he was imminently going to take his own life. They believed that he was attempting to control his housing situation, and while they weren't trying to make this decision to prevent him from controlling housing, they were trying to make this decision to prevent him from continuing to engage in self-harm, whether it was on this day or any other day. But again, how can they know that without doing any further evaluation? Because this is an inmate who, on numerous prior occasions, actually had attempted suicide. So maybe there are times where it's, you know, it's idle threat, but other times, it's clearly sufficient of a crisis that it causes actual suicide attempts. How can they know which one this is without any further inquiry? If that was the standard, then every individual who continued to be manipulative in their threat, every time they reported that they, you know, hey, I might hurt myself today, I am upset today, I have suicidal ideations today, it would require then that there would be a standard, that it would be, you know, a policy that this is specifically what psychiatry providers have to do, and here they're using their judgment. So, you know, it's interesting you say that, because in a Med-Mal claim, usually it's the plaintiff's burden to establish what the standard of care is. You say, you know what, when a person presents with kidney failure and this and this, you know, this is how we deal with it. And a failure to present evidence of what the standard of care is, and then depositions or transcripts of depositions or some sort of evidence that response fell below the standard of care, that's what a plaintiff needs to be able to survive summary judgment and get before a jury. What do you think, what do you, how do you think that transposes in the 11th, in the 8th Amendment spectrum, and then how does that transpose into the record? Because it strikes me, you know, is the 8th Amendment easier to prove now than Med-Mal, where the plaintiffs don't need to show up with any evidence of a standard of care? Because that would make Med-Mal much easier to show than deliberate indifference in the 8th Amendment, once you had some degree of awareness of self-harm. And then what is there in the record that would show what the prevailing standard of care is? Because at the end of the day, at summary judgment, you can, a defendant can, or a non-moving party can prevail by the absence of evidence in the record for which the plaintiff bears the burden of proof at trial. So is there anything about standard of care in the 8th Amendment context that a plaintiff has to have, and is there any of that evidence in the record? So here, the burden is on the plaintiff to demonstrate facts that these individuals engaged in deliberate indifference. The record here is that these individuals believed that he was being manipulative. But let me just focus on the reasonableness of the response, because a lot of this comes down to, did they respond reasonably? And in the Med-Mal case, if you want to find out if a physician or a medical provider acted reasonably, you would get standard of professional medical care for the community, or something along that, depending on state law. Sure. And so here, there are records leading up to this date where Dr. Bloom and other providers all came to this same conclusion, that this was not an individual who would benefit from the POC. Then there's the subsequent note from Dr. Bloom indicating that he continues to have this same belief on February 16th. So I get where you're at with the facts, and I think those make a case. But what you typically see in a Med-Mal case is you see another physician show up and say, when a person presents with, you know, X condition, it's below the standard of care to ignore that, or to treat it in Y sort of way. And so that's essential to a Med-Mal case, is to say this is what the professional standard of reasonableness is, and then you have the question of fact being whether a person met that. And so I'm saying, how do we baseline? Are we looking at our case law to determine what the reasonable response is, as opposed to kind of what happens in the context of Med-Mal, which is we look at what other physicians would say this is reasonable? Well, there is no evidence here that other physicians disagreed that this was unreasonable. There's no other providers here who have, you know, the patient's chart. What we have here are the records of our providers and the affidavits of those individuals indicating that this is what they were planning to do, and that it was reasonable. And that's what's necessary on a deliberate indifference claim, not that there is some specific question on the breakdown of the standard of care from a, you know, expert versus expert scenario. Rather, we're giving deference, and that's what the case law is, that we give deference to the medical judgment of medical providers. And that's what the district court did here. She gave deference to the decision-making of Bloom and Knowles, based on the fact that they were considering that this individual had a history of this type of behavior, and that they were making a plan in an attempt to stop it. Why isn't that the question for the jury, rather than the judge here? Because the evidence is, because there's no evidence that contradicts that. There's no declaration. There's no medical record. There's no testimony from another doctor that they were wrong in their reasonableness. The deference that is being given is to be given by the court, not by the jury. If there was a question as to whether or not these decisions were wrong, and that was in the record, then that would be a question for the jury. But here, this is the test for deliberate indifference. How do you distinguish this from the hypo in the amicus brief of the diabetic, where the physician makes the professional judgment that the best way to motivate the patient to change their diet is to just let them go into diabetic shock? Well, I would say initially that the amicus brief is essentially a backhanded way in an attempt to get expert opinions involved in a case that don't involve expert opinions. These opinions are not a record. They are not something that the district court considered, and they are not applicable at any level. Even if the court at the summary judgment level had received these reports, they wouldn't have been- Assume it's my hypothetical, not theirs. I'm just asking you, how is it different than evaluating a situation where you have a patient who is not following the doctor's advice? The doctor is concerned that the only way that they're going to make a change in their diet is to let them go into hypoglycemia. Well, because in that scenario, there are other medical alternatives that are and can be effective, right? Their insulin can be provided to make a difference. I am not an expert in the treatment of diabetes, but there were other things that could have been done. Here, our providers could not find something that was effective for this individual. You said a moment ago that there were lots of other things, of course, they could have done. They could have put him in restraints. Well, I'm saying that there are a variety of things that can be done for individuals who are suicidal, but we have to look to the actual context of that, right? Someone who is having a psychotic break and is throwing themselves off of the top bunk of their cell, perhaps it's appropriate to put them in restraints, but that doesn't necessarily apply here when there's an individual who is not presenting in that manner, right? The belief of these providers is that he is trying to control his housing, not that he's having some mental break that would require restraints. I guess what we're trying to get at, is that a jury question? Because on one hand, it could be a product of professional judgment, depending on what information was given or received or asked about on the phone call. For instance, if, you know, to your point about someone throwing themselves off the top bunk, if she had said, well, he's rocking and crying and, you know, whatever, biting his wrist and he's got a plan, they received all of that, that sounds like it could be a product of professional judgment. If she just says, I think he should be assessed for POC placement, and they just say no, that seems like less of a, it seems like that could be more of a jury question about whether or not that's professional judgment. Because whether or not it's a product of professional judgment would seem to depend on what information is in their possession at the time the decision is made. And that's very fuzzy in this record here. And I think that's what we're trying to do, is to get a sense of what is a product of professional judgment when it's really not clear what was known, what they assessed, how they made the assessment at that point in time. So I think because they had information about him historically as well. So we do know that he... So before you go on, I, we're on the same page, I'm just trying to keep this short, because we all know that there's this, we've all looked at it a lot, as, you know, I think you can tell. So is it your position then that a product of professional judgment on this date only needed to be based on historical notes and assessment, and even just a perfunctory, he's having suicide, he says he's having suicidal thoughts. That, if that's the totality of what they were told, it's still a product of professional judgment and not a jury question. Correct. In your opinion. Okay. That's your argument. Okay. Any other questions? Thank you, Your Honor. Your Honors, I'd like to make a few points in response to Counsel for Bloom and Knowles, and then a few in response to Sibylla's counsel. First, on the issue of deference, this Court's cases make very clear there's no deference to medical professionals' judgment in cases involving denial of care, which is what this is. Turning to the related question that Judge Phipps raised about the role of standards of care, expert evidence, what Pearson addresses this very, very clearly, what Pearson says is that in denial of care claims, expert evidence is not necessary, because there's no presumption that the defendant acted properly, and there's no requirement that there be any sort of objective inquiry into the propriety of their actions. Now, that's not to say that expert evidence can't be introduced on standard of care. It's just not necessary in a denial of care claim. Even in an adequacy of care claim, though, if Your Honors prefer to view it that way, still there are situations, and Pearson says this too, where a lay person could conclude that doing nothing or that not taking certain steps violated professional standards. That's just like the nurse defendant in Pearson. Now, the other point I want to make here is that any argument that expert evidence was required here and that that's a basis for affirmance, that has been affirmatively waived by Bloom and Knowles. They say in footnote four of their brief, expert opinions regarding the standard of care are irrelevant to arguments of deliberate indifference. Now, that is an incorrect statement of law that is directly contradicted by Pearson. However, it nonetheless is an affirmative waiver of any sort of argument that we needed expert evidence here. Counsel for Bloom and Knowles said that they had already determined in the past that ignoring him was the best course. Failure to consider the new facts they were given on this day in question and relying on this decision that they had made a month or two before, that's deliberate indifference. The move from one unit to another, that's not – and the fact that that triggers the self-harm incident, that's not necessarily evidence of a motivation for secondary gain. A jury could just as easily conclude that that was a reaction by a mentally ill person to a stressful situation, a situation that the prison recognizes is stressful. Turning to Civello, I just want to emphasize and be very clear that I'm using the words, you know, waiver and forfeiture, you know, knowingly here, there's a distinction, as your honors know, and this was a waiver for Civello on the first two prompts. So that's, you know, this court can affirm on any basis as long as it's not waived. And those things were waived. So anything to do with Civello's knowledge at any stage is sort of off limits here. I think I heard counsel for Civello say that Civello conveyed the imminence of the situation to Bloom and Knowles. That is not supported by the record. She writes in the medical record that she wasn't able to determine whether he had immediate intent to harm himself. Now, we of course dispute that, but she, there's no support for the idea that she conveyed the imminence of the situation. And I see I'm out of time. So unless the court has any questions, thank you very much. And we urge you to reverse. Thank you. Thank both counsel. Excellent briefing and oral argument to cap off our long afternoon. And in light of that, I think it would be helpful to have the transcript of this argument as well. So we'll ask for us to do that and to split the cost. We'll take the case under advisement. Good afternoon.